**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In the Matter of Laurene Yu | AMENDED COMPLAINT |
| *Plaintiff* | *17cv7327 (AVN-BXM)* |
| **vs.** | |
| City of New York | REQUEST |
| 100 Church | |
| New York, NY 10007 | FOR JURY |
| And | |
| Administration for Children Services (ACS) | |
| 150 William Street, New York, NY 10038 | |
| *Defendants* | |

## THE PARTIES

1. "I", Pro Se Plaintiff, Laurene Yu is a citizen of the United States, and resident of State of New York, New York County. At all times resided in the State of New York.

2. Defendants are Administration for Children Services (ACS), and City of New York (the "City"), is a municipal entity created and authorized under the laws of the State of New York.

3. ACS is headquartered at 150 William Street, New York NY 10038

## PLACE OF EMPLOYMENT

4. I worked at City of New York, ACS and sought employment by the City of New York.

## CAUSE OF ACTION

5. This employment discrimination lawsuit is brought under claims of Title VII of the Civil Right Act of 1964, as amended (42 U.S.C. §§2000e-17) for employment discrimination on the basis of race, color, national origin; hostile work environment; and for on-going retaliation in opposition to the discriminatory practices by the defendants in violation of the same laws.

6. The Defendants discriminated against me because of my race (Asian), color (yellow), and National Origin (Chinese).

7. This employment discrimination lawsuit is brought under Equal Protection Clause, USC 1983 and 1981, where the defendants violated my civil rights and failed to protect me equally.

8. This employment discrimination lawsuit is brought under The New York State Human Rights Law (SHRL), N.Y Exec Law §§290 to 297 and The New York City Human Rights Law (CHRL) for employment discrimination on the basis of race, creed, color, national origin;

hostile work environment; and for on-going retaliation in opposition to the discriminatory practices by the defendants in violation of the same laws.

9. Venue is proper in the Southern District of New York.

## FACTS/BACKGROUND

10. Pro Se Plaintiff, Laurene Yu is female. I am non-white, Asian, of Chinese descent, yellow in skin color.

11. In about May 2008, I was hired by the City as a permanent graphic artist for Administration for Children Services (ACS).

12. Up until termination, my work performance, time and attendance have met or surpassed the reasonable and objective expectations of ACS in its in-house graphics unit.

13. Defendants refused to officially change my salary and grade level, despite winning labor grievances. Others were given liberty to simply change their office titles.

14. At all times, Defendants kept me in the hostile work environment at ACS, Division of Administration, despite shuffling me from supervisor to supervisor.

15. As alleged in further detail below for nefarious and humiliation reasons, Defendants built up a practice of using City resources to punish and persecute me since I protested against their illegal wrongdoings and mismanagement.

16. As alleged in further detail below, the discrimination within minorities was not limited to hiring and promotion decisions. Discrimination within ACS minorities extends to the enforcement of workplace policy, the imposition of discipline, training and career opportunities, and, generally, the terms and conditions of employment.

17. The purpose of the Defendant's adverse employment actions including relocation to Brooklyn

warehouse in 2016 was to humiliate and oppress me, to cause me to be subjected to scorn and ridicule within, to interfere with my career, create financial ruin and to deny or delay justice. All of this was motivated, at least in part, by selfish animus toward me based on race and retaliation.

18. The purpose of the back-to-back, discipline charges, was to maliciously prosecute me as cruel and unusual punishment, using Defendant attorneys Susan Hochberg, Susan Starker and Kaytlin Simmons under the control of white men, Deputy Commissioner Joseph Cardieri and Assistant Commissioner Michael Hannon in Division of Administration (group) [1].

19. Documented in my facts, Defendants have a pattern of discriminatory motives, retaliatory animus, and only provided protection to certain staff, since Defendants did not investigate my claims, nor give equal weight to my claims.


**5/2010 to 6/2016 PERVASIVE HOSTILE WORK ENVIRONMENT**

20. In 2010, I filed an internal ACS EEO discrimination complaint about Michael Hannon, white male, Assistant Commissioner, who was consistently acting odd when I asked him work-related questions. Hannon could not look at me in the eye, shivered and fidgeted, nor wanted to meet with me when I had very time-sensitive questions.

21. I would later learn that Hannon's erratic behavior was also because had substance abuse issues, but was still employed.

---

[1] Cardieri, Starker, Hochberg, Hannon would be known as "group"

22. My discrimination complaint about Hannon only went worst for me since I also later found out Hannon was kept employed despite him loosing a NYS sexual harassment lawsuit, and was still working in the same position.[2]

    a.  Hannon's lawyer was ACS attorney Susan Hochberg who also worked in the ACS Employment Law Unit. Hochberg's direct boss was Susan Starker, and their Deputy Commissioner was Joseph Cardieri, esq.

    b.  I learned that Cardieri, a political appointee, was protecting his friend Hannon. To keep their positions of power, and cover up for their wrongdoings, the group pursued me with petty and malicious discipline charges. *id1.*

    c.  It did not matter if Hannon knew anything about my line of work, the group interfered with best business practices.

    d.  At one time, Hannon's comment to me at a labor meeting "I did not have to do such a good job," perplexed me.

    e.  Hannon and group, insisted on preserving the hostile work environment for me by micromanaging and having me report to miscellaneous workers[3] at all times.

23. In 2013, under hostile work environment, instead of promoting, or keeping me within the duties that I had already been successfully been doing, Hannon replaced me with a white woman named, Laura Postiglione in charge of my area.

    a.  Postiglione was a new employee, and worked at ACS for only 3 months.

    b.  Postiglione was quickly deemed incompetent, in her management position as Press Secretary.

---

[2] ACS is presumptively liable if her supervisor(s) knew of sexual harassment and was part of the background hostile work environment. *Burlington Industries v. Ellerth*, 524 U.S. 742, 765 (1998); *Fairbrother v. Morrison,* 412 F.3d 39, 48-49 (2d Cir. 2005).

[3] Miscellaneous workers, I was the only staff graphic artist.

c.   Probation is usually 3-6 months for management, 1-year for permanent civil

    servants, but Postiglione was able to keep her employment entirely.

d.   Postiglione's reassignment was quick and swift, despite my persistent pleading

    for a simple higher grade, and pay rate.

e.   For discriminatory reasons, I was not given the higher grade, and pay rate

    despite the fact I was qualified, had seniority, and well-liked.

    i.   There were no complaints with my services, except with the supervisors

        in charge.

    ii.   The group failed to discipline other rank and file workers who were less

        productive, and unprofessional.

f.   For retaliatory reasons, the group, was furious:

    i.   I had filed a discrimination complaint against Hannon.

    ii.   I  consulted with the lawyer that beat them in the NYS sexual

        harassment lawsuit.

    iii.   I filed labor grievance asking for rightful pay.

24. In March 2013, after only one month under Postiglione, I was still performing more or less the

    same duties as Postiglione and did not receive the same pay.

a.   I trained Postiglione because she wasn't a graphic artist, a new employee and

    did not know how to use the MAC computer.

    i.   Postiglione asked me how to turn on the MAC computer.

b.   Defendants purposefully denied my level change, continued to oppress me

    because they knew a disparate treatment claim would be justified.

c.   Prior to 2013, there were interns and temps who needed supervision as graphic

    artists.

25. After Postiglione found out I filed a work grievance, Postiglione began to micromanage me even more, given me 'simple tasks' such as putting files on a flash drive for her, despite our duties being similar.

26. Postiglione, still furious about her demotion, made the comment to another co-worker, referring to me *"they should go after the Asian girl."* (See also *id1*).

27. When I heard the racist comment, I filed a SHRL complaint about this racially charged statement and the hostile work environment.

28. Two weeks later, in about April 2013, Postiglione irately came over to my desk to interrogate me about the SHRL complaint. She said "it wasn't very nice of you to file a claim about me." I stated I wasn't comfortable talking about it with her and asked her to leave.

29. The same day, Postiglione soon came back with a "simple task" which proffered into discipline charges, and an emergency suspension. *See Def's (defendant's)* Exhibit C.

    a.  The emergency suspension, without pay, with me being escorted out from Security was due to Postiglione's feeling of fearfulness, while accusing me of throwing a 1" flash drive weighing 1 oz.

    b.  Hochberg, Hannon and Postiglione collectively had the discipline charges drafted up within the hour and I was immediately escorted out of the building and suspended for 30-days without pay.

30. During my 30-day suspension in 2013, I updated my SHRL complaint to include retaliation since the discipline charges in timing was very close to my SHRL complaint.

31. During my 30-day suspension in 2013, I filed for NYS unemployment and received a week of pay.

32. During my time at home, without pay for 30 days, the hostile propaganda continued, Assistant Commissioner, Sharon McDougall, Postiglione's immediate supervisor, emailed me at home,

and told me I was not allowed to visit any City property, because I signed up for volunteer work prior to this incident.

33. The NYSHR officer closed my claim because I knew that the intake person was related to the ACS EEO intake officer; Yonette Scott and Yvette Scott.

34. Around May 23, 2013, a few days when I returned from my 30-day suspension, I found a note on my desk "*Go home chinese girl.*"

        a.   I had mentioned the disparaging comments to Defendants and they did nothing to follow up on it.

35. Around June 2013, I then filed an EEOC complaint for discrimination and retaliation for the ACS' discipline, and received a Right to Sue Letter.

36. Around July 2013, I filed an Article 78, in the NYS Court System, to challenge the 30-day suspension.

37. In 2014, after a labor arbitration, I did not receive a promotion, grade level change, or raise, but won the grievance.

        a.   The Defendants took back money I won and earned, due to their discriminatory and retaliatory actions because they could.

38. In January 2015, I applied and was denied application, and blocked for Mayors Scholarship where Personnel Director Faustina Haynes, stated *"the agency is not able to support me."*

39. I was qualified for a Mayors Scholarship, that offered me money for training and school, but I was blocked from even applying.

40. In January 2015, I was moved to Office of Deputy Commissioner's, in the Division of Administration to report to then Chief of Staff, Robert Martin.

41. Martin also threatened to write me up while only working under him for 2 months.

42. In June 2015, I reported to former Associate Commissioner, now Special Advisor, Dan Sedlis who reported to former Special Assistant, then Chief-of-Staff, Kaytlin Simmons, Esq in the Office of the Deputy Commissioner of Administration.

43. In October 2015, I reported a query to then Commissioner Carrion re Susan Hochberg who was possibly violating the Hatch Act, campaigning to be Judge on working hours.

44. In November 2015, after work hours, I was physically threatened. A young black couple with a baby stroller had seemed to target me. Instead of asking other people on the street, they focused on me and begged me for money. I reached for a quarter in my pocket, but the young guy complained and called me a "bitch." The young girl got insulted and offended and reached into her pocket and threw broken glass at me. This was clearly suspicious activity as there were other bypassers on the street, but they were fixated on me. As I tried to walk away, the young black man followed me, and I found the nearest Starbucks to duck into. The young black man did not go into Starbucks, and as I watched them both leave together, they did not stop anyone else for money. Their baby stroller also was pushed like it had no weight. From my view seemed like a doll and staged.

45. At all times, I was being watched. Defendants had and have access to my home and personal information.

46. On many occasions, 2014-2016, my home computer was disruptive.

   a. Assistant Commissioner, Anil Sharma of I.T/Computer department was privileged in knowing my discipline records whenever I was suspended since they had to lock down my passwords, and intercepted my log in info when using remote access.

47. On many occasions from 2014-2016, I reported that I.T/Computer department was sabotaging the City computer so I could not perform my tasks.

    a.   I.T workers knew about my daily calls to the Help Desk and inability to perform tasks, having hundreds of HelpDesk tickets which were never fully addressed.

48. In Dec 2015, I complained to Personnel and ACS EEO office, then Chief of Staff, Kaytlin Simmons, Esq, was continuing their hostile treatment towards me.

49. As Chief of Staff, Simmons allowed the continued sabotage and disruption of the City property keeping me out of meetings, and withholding computer resources I needed to complete the tasks.

50. In Jan 2016, Supervisor Dan Sedlis retired, but was asked by urgency by Kaytlin Simmons, esq and Susan Hochberg, esq to reprimand me before his last week of retirement.

51. Simmons urged Sedlis to write me up, because Simmons knew that she would violate a disparate treatment amongst her assistant, Stephanie Rewitiwiran and myself. See *Def's Exhibit G.* (Rewitiwiran was not mentioned in the report of the 4 witness mentioned at the hearing).

52. On March 10, 2016, I submitted a Workplace Violence Report due to Defendant's retaliatory treatment.

53. On March 13, 2016, I was accused of threatening behavior by Simmons, disciplined for 30 days without pay, and then was threatened termination by ACS attorneys Starker, and Hochberg, esq.

54. I reported to Simmons for two (2) months.

55. On March 13, 2016,  my complaints were dismissed by Defendants. Defendants did not investigate my side of the story regarding Simmons and myself.

56. My complaints were brought to the attention of the Security Office, and they shrugged it off.

57. On March 16, 2016, while at home, I communicated with ACS Director Starker, and asked "what does Management want from me, so I could readily improve?" Starker answered misguidingly "*the Union would assist.*"

58. On March 23, 2016, I filed for NYS Unemployment for my 30-day without pay, indicating it was through no fault of my own, and received a claim.

59. On April 13, 2016, returning back work to ACS headquarters, 150 William Street, Head of Security, Assistant Commissioner Andre Brown gave me 2 hours to leave and pack all my belongings, rushing me to Carnasie, Brooklyn warehouse, one hour commute from my home.

    a.   I was stigmatized and shamed as workers being transferred to Carnasie warehouse was where people disappeared and held for detention.

60. On April 14, 2016, I was scheduled for a class at City-Wide training center, but was embarrassed, called out and pulled out of it in front of a room of 40 people.

61. On April 15, 2016, I inquired about Workers Compensation being hurt on the job during my rushed packing to be removed off-site.

    a.   The administrator said ACS would fight you tooth and nail, so I walked away.

    b.   ACS is known as a top-heavy agency, full of 'attorneys' and 'supervisors'.

62. On July 2016, I filed an internal agency EEO complaint of retaliation due to my involuntary relocation to the Brooklyn warehouse; again was dismissed.

**300 days pre-EEOC**

63. In August 2016, Supervisor of the Brooklyn warehouse, Kenny Charles, Assistant Commissioner Andre Brown, and Susan Starker altered my timesheet without my knowledge or consent to withhold (2) days of pay.  I was cheated time and days of pay.

64. On August 28, 2016, at the hearing regarding the 30-day suspension, Susan Hochberg, esq said "*I should resign.*"

65. On September 11, 2016, I went to report abuses at Department of Investigation (DOI), in which I saw an ACS director at the location.

66. September 15, 2016, Personnel at ACS called me and forced me to return to 150 William headquarters that same day, from Brooklyn, to retrieve a termination letter.

67. On September 15, 2016, Personnel asked for my I.D., and was escorted out, and the Security guard laughed in disbelief when he saw me.

68. When I passed the Security Desk in the lobby, my picture was already printed and posted.

69. On February 6, 2017, the Civil Service Commission (CSC) upheld my termination, and 30-day suspension regarding "incompetence, insubordination, and misconduct"

    a.   I was denied reinstatement.

    b.   I was denied a transfer to another city agency.

70. In February 2017, Starker sued ACS for her demotion of incompetence and negligence.

71. In March 2017, I emailed NYC Department of City Wide Administration and Services (DCAS) Commissioner Lizette Camilo, who referred my issue to then Chief of Staff, Quintin Haynes, and emailed me, responded "*I should reach out to ACS.*"

72. In May 2017, I applied for NYS Unemployment and won it once again through adjudication.

73. In July 2017, I applied for internship for City of New York, was interviewed, and never heard back.

74. In July 2017, I filed a complaint with the EEOC for discrimination and retaliation.

75. In August 2017, Starker's case to sue City of New York was denied, and dismissed.

76. On September 18, 2017, the Defendants closed my case to appeal my NYS Unemployment.

77. On September 22, 2017, I exhausted mediation, administrative and collective bargaining remedies.

78. On September 25, 2017, I filed a Discrimination & Retaliation complaint with SDNY.

## ERRORS in Administrative Offices and ALJ rulings

79.  Since 2010, the Administrative offices at ACS knew about Assistant Commissioner Hannon and the hostile work environment, dismissing my complaints, were prejudicial, intentionally quashed me, and punished me with disparaging disciplinary charges.

80. The Administrative Law Judges at the City of New York made gross errors, and were prejudicial in their reports and findings.

81. In 2010, the first error of judgment was when I reported discrimination and hostile work environment to the internal ACS EEO office, re Assistant Commissioner Michael Hannon.

    a.  ACS dismissed my complaint in 2010, well-knowing of Hannon's behaviors.

    b.  ACS knew about Hannon's sexual harassment case and still kept him employed in the same position.

    c.  Hannon lost his sexual harassment case using ACS attorney Susan Hochberg as his defense attorney.

    d.  The group, conspired to see my demise, including keeping the hostile propaganda towards me alive.

    e.  The group was furious and retaliated against me, when I consulted the attorney the plaintiff used against Hannon.

        i.  The attorney I counseled with sued Hannon, and won.

        ii.  Hochberg, from ACS, was Hannon's attorney and lost the case.

82. In 2013, when I reported discrimination against Postiglione, to the internal ACS EEO office, my complaints were dismissed again.

83. The 2013, I filed an NYSHR; and at the same time, Postiglione and the group was pressing charges against me.

84. Due to a conflict of interest, my NYSHR complaint in 2013 was closed because Yonette Scott at NYSHR and Yvette Scott at ACS were related.

85. During the City hearing in 2013, Administrative Law Judge (ALJ) Kara J. Miller knew about my NYSHR complaint; knew I filed other complaints, but did not take the hostile work environment into consideration. See *Def's Exhibit C, Report, Findings and Recommendation.*

    a.  Postiglione in her report said she had just "simply changed office titles."

    b.  As alleged in detail, even with my 3 labor grievances awarded, ACS would not 'simply' change my office title. In comparison, there was nothing 'simply' offered for me.

    c.  During the hearing, Postiglione's union rep testified on my behalf.

    d.  Postiglione said she was in the union for analysts, line staff, and not Management.

    *e.*  Postiglione testified she did not recall if the flash drive actually hit her, and was unable to recall respondent's exact comments… " See *Def's Exhibit C, pg4*

    *f.*  Postiglione's testimony was corroborated by Marmelejos (a temp worker). See *Def's Exhibit C, pg4.*

    g.  ALJ Miller's comments were also prejudicial and harsh about me stating I "was "extremely hostile, self-serving and contrived, fabricating testimony, masking her contempt."

    h.  ALJ Miller knew I had NYSHR complaint, filed and won labor grievances, and did not look at my version of story.

    i.  The City hearings were prejudicial and fixed, and is slander, false and libel.

86. Despite the unfiled judgment of the Article 78, NYS Supreme Court, I did not did not appeal my pro se complaint. See *Def's Exhibit F*

87. The third administrative error, occurred on the City hearing in 2016, ALJ Alessandra Zorgniotti's report and recommendations. See *Def's Exhibit G*

88. The report and recommendations stated corroboration of 4 witnesses but only 3 witnesses documented; Edmund, Mathis, and Sergeant Evans. See *Def's Exhibit G-pg8*

    a. The report intentionally omitted Stephanie Rewitiwiran.

    b. The 4th witness intentionally omitted on the report was a young, 20-something Afro-Carribean woman, Stephanie Rewitiwiran, who was Simmons's 'special assistant'.

    c. In 2014, Rewitiwiran started out as a college intern, reported to Postiglione.

    d. In 2016, Rewitiwiran hired, as staff, and reported to Simmons as "Special Assistant".

    e. The report also stated "while there were some minor discrepancies between the witnesses' testimony…. were of the type to be expected in a trial." See *Def's Exhibit G; pg8*.

    f. "Simmons's who is no longer supervising respondent, (plaintiff) had no apparent motive to lie." See *Def's Exhibit G; pg8*

    g. ACS attorney Susan Hochberg authored the ALJ Zorgniotti's report as it was so intimate and fast in the details.

    h. As stated ALJ's decisions are based "however, to the extent there were discrepancies between the petitioner's witness and respondent, resolution relied on a determination of witness credibility. In order to determine credibility, this tribunal has looked to witness demeanor, the consistency of a witness' testimony, supporting or corroborating evidence, witness motivation, bias or prejudice, and the degree to which a witness' testimony comports with common sense and human experience in determining credibility. Dept of Sanitation v Menzies, OATH Index No. 678/98 at 2-3 (Feb 5, 1998), aff'd, NYC Civ Serv Comm'n Item No CD 98-101-1A (Sept.9 1998). Citing

"Simmons, and her witnesses were credible," stating no apparent motive to lie. See *Def's Exhibit G.*

i.   In conversation while reporting to Simmons, I asked if Simmons would proffer discipline charges for Rewitiwiran of an incompetent task she did; Simmons did not.

j.   Chief of Staff, Simmons, a provisional candidate at that time, portrayed herself as a professional who graduated with dual degrees of JD/MBA at Columbia University and was the one who published an article about herself in the agency newsletter, had every reason to lie and puff herself up.

1)   "Simmons was on the Agency Staffing Actions Committee, the agency representative of the New York Advisory Council, agency representative for Local Law 29, and Mayoral Directive One Compliance, member of the Reasonable Accommodations Board, and the main point of contact for internal and external entities for Division of Administration (Tr9-10)." See *Exhibit G, p2*

2)   Simmons was a former Special Assistant, then promoted to Chief of Staff in Division of Administration, ousting Robert Martin.

3)   Robert Martin, former Chief of Staff, also received a new title, Director of Compliance.

4)   Staff announcements for Simmons and Martin were made public in the ACS newsletter.  Newsletter citing Simmons' impressive qualifications in her dual degree with JD/MBA from Columbia University.

5)   Simmons was a young female in her 20s.

6)   Simmons's dispute of signing my timesheet, and making issue of request for one hour overtime should be deemed hostile, since ACS had one of the highest overtime in the City agencies.

7) Simmons a black female, and all her witnesses were of Black/Afro-Carribean, makes the collusion, even more incredible.

89. As alleged in detail, the Supervisor's change of title contributed to hostile work environment, her appointments and raises whether self-imposed, or officially given, title changes happen to be occur however ACS employees see fit. In contrast, my wanting a level and grade change met great opposition with the defendants.

90. The City administrative office, CSC concluded that my termination was justified in my incompetence, and misconduct. But, at no time was I incompetent and performed misconduct.

    a. Defendants never giving me a performance improvement plan.

    b. Supervisors acted like bullies.

91. The district court error in my denial for pro se to amend my complaint. *See* Branum v Clark, 927 F. 2d 698, 705 (2d Cir 1991).

92. The second circuit court has questioned whether my claims are time barred.

93. As alleged in detail in my complaint, in violation of Equal Protection Clause, the defendants did not pursue my complaints and were inequitable in my investigations.

*94.* As alleged in detail in my complaint, the predatory behavior, collusion of the defendants, through abuses of power, liberty of changing office titles by supervisors, removing and changing of my supervisors throughout my years in employment, removal of my work production, dismissal of my complaints, slander and false reports, and physical threats on and off work site, created and preserved the abusive and hostile work environment or 'house of horrors' that I endured; "*They should go after the Asian girl.*"[4]

95. See *City of New York vs. Michael Hannon; Connolly vs City of New York, Joseph Cardieri, Susan Starker, etc. (*Defendants are presumptively liable if her supervisor(s) knew of sexual

---

[4] https://nypost.com/2017/01/25/how-acs-failed-to-save-this-5-year-old-boy-from-a-house-of-horrors/

harassment and was part of the background hostile work environment. *Burlington Industries v. Ellerth*, 524 U.S. 742, 765 (1998); *Fairbrother v. Morrison,* 412 F.3d 39, 48-49 (2d Cir. 2005).)

## ADMINISTRATIVE PROCEDURES

This Amended Complaint surmises from permission from the second circuit court to vacate the district court's decision to allow pro se claimant a leave to amend. *See* Branum v Clark, 927 F. 2d 698, 705 (2d Cir 1991).

## RELIEF

**WHEREFORE**, I, Pro Se Plaintiff demand the following relief against the Defendants, jointly and severally:

a) Compensatory damages in an amount just and reasonable in conformity with the evidence at trial;

b) Punitive damages to the extent allowable by law;

c) Cost and disbursements of this action;

d) Interest;

e) Reinstatement at a proper venue;

f) For such and further relief as this court deems just and proper.

## VERIFICATION

By signing below, I certify to the best of my knowledge, information, and belief that (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

June 1, 2020

Laurene Yu
335 East 14, #52
New York, NY 10009
(917)592-5889 laurene.yu@gmail.com
