Second Amended Complaint:17Cv.7327 (AJN-BCM)

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In the Matter of Laurene Yu<br>*Plaintiff*<br><br>vs.<br><br>City of New York<br>100 Church<br>New York, NY 10007<br>   And<br>Administration for Children Services (ACS)<br>150 William Street, New York, NY 10038<br>   *Defendants* | SECOND AMENDED COMPLAINT<br>*17cv7327 (AVN-BXM)*<br><br><br>REQUEST<br><br>FOR JURY |

This document was prepared with assistance from the New York Legal Assistance Group's Legal Clinic (NYLAG) for Pro Se Litigant's in the SDNY.

# THE PARTIES

1. "I", Pro Se Plaintiff, Laurene Yu is a citizen of the United States, and resident of State of New York, New York County. At all times resided in the State of New York.

2. I worked at City of New York, ACS and sought employment by the City of New York.

3. Defendants are Administration for Children Services (ACS), and City of New York (the "City"), is a municipal entity created and authorized under the laws of the State of New York.

4. ACS is headquartered at 150 William Street, New York NY 10038

# CAUSE OF ACTION

5. This employment discrimination lawsuit is brought under claims of Title VII of the Civil Right Act of 1964, as amended (42 U.S.C. §§2000e-17) for employment discrimination on the basis of race, color, national origin; hostile work environment; and for on-going retaliation in opposition to the discriminatory practices by the defendants in violation of the same laws.

6. This employment discrimination lawsuit is brought under The New York State Human Rights Law (SHRL), N.Y Exec Law §§290 to 297 and The New York City Human Rights Law (CHRL) for employment discrimination on the basis of race, creed, color, national origin; hostile work environment; for on-going retaliation in opposition to the discriminatory practices by the defendants in violation of the same laws, and wrongful termination.

7. The Defendants discriminated against me because of my race (Asian), color (yellow), and National Origin (Chinese).

8. Venue is proper in the Southern District of New York.

**FACTUAL BACKGROUND**

9. Pro Se Plaintiff, Laurene Yu is female. I am non-white, Asian, of Chinese descent, yellow in skin color.

10. In about May 2008, I was hired by the City as a 'permanent'[1] graphic artist, level 1, for Administration for Children Services (ACS) for the City of New York.

11. Up until termination, my work performance, time and attendance have met or surpassed the reasonable and objective expectations of ACS in its in-house graphics unit, and Division of Administration.

12. Despite my consistent proven merits and ability to complete assigned tasks with due diligence, and satisfactory results, Defendants continued to single me out for my Race and National Origin between 2010 and 2016, as I was the only Chinese American employee in my unit, and representative of less than 1% through out City of New York employees.

13. I believe I was discriminated on my Race and National Origin and substantiated the statement with facts mentioned below. Facts listed in my revised Amended Complaint have not been brought up before in administrative trials and thus should be considered as new facts for my current case.

14. In NYC OATH Index No. 269/13 (Apr.4, 2013) case, facts presented and argued by both parties only covered a dispute between supervisor Laura Postiglione and myself on downloading a copy of a graphical project on May 31, 2012. Postiglione was my supervisor from November 2010 until January 2013. Postiglione asked me to download files on a flashdrive and reminded me not to import any text onto the documents that I was working on,

---

[1] www1.nyc.gov/site/dcas/employment/civil-service
Appointments to competitive class titles can be permanent (if appointed from a civil service list) or provisional.

meaning excluding my name in the credits section of the document. I questioned Supervisor Postiglione about why she gave herself credit, and why my name wasn't listed. Postiglione explained it was not appropriate to ask questions and to decide whose name goes into the credits section. The tension between Postiglione and myself escalated as Ronald Lehman, who was then an analyst for the agency and a union representative testifying at the proceedings, observed and alleged at the proceedings that in late 2011 or early 2012, Ms. Postiglione approached him and told him that it was not fair and "*they should have gotten the Asian girl.*" Mr. Lehman explained that he knew it was the me who Postiglione was referring to because he was familiar with the unit and the I was the only Asian woman there. This fact is different from the incident that happened in March 2013 where Ms. Postiglione made a similarly racially-charged comment to another co-worker that "*they should go after the Asian girl.*"

15. In NYC OATH Index No. 1924/16 case, facts presented and argued by both parties only covered a dispute between Supervisor Simmons and myself from requesting my timesheets be timely approved. The incident happened on 3/10/2016 and the facts presented were about the interactions on 3/10/16 and my follow-ups with the employer between 3/10/16 and 3/25/16. The incident started when I asked Simmons to approve the timesheet and one hour overtime. Simmons told me to wait to hear from timekeeping and then solve any discrepancies regarding overtime work or scheduling of lunch breaks. This fact is different from incidents that happened after my relocation and demotion to Carnarsie Brooklyn Warehouse.

16. Between 2010 and 2016, I, petitioned Defendants (four times) for a salary adjustment, and/or a title change given my excellent work performance, and doing the labor of two additional staff that the unit previously had. I was consistently denied advancements throughout my tenure, despite winning labor arbitrations.

17. Between 2010 and 2016, I requested computer training, and other training towards professional development and improvement, but was consistently denied, despite my suggestions, and never offered despite Defendants' numerous accusations and disciplines charges.

18. Between 2010 and 2016, supervisors and workers of less, and different qualifications to my area of expertise, were hired. The workers and supervisors of lesser qualifications were given all types of training and development, given opportunities for advancement. In comparison I was shunned and discriminated and disciplined for my race, ethnicity, and protesting illegal activities. At the time of hiring, I was highly qualified for my position, as I scored 100% on a civil service admission exam, had more than 10 years experience, and held a Bachelors Degree in the Arts from a reputable private institution. I also had tenure and longevity more so than Laura Postiglione[2] a white woman who was hired as my Supervisor; Johnny Marmelejos[3] a male temp; and Stephanie Rewitiwiran[4] a female college intern, who were all trained in the graphics unit that I originally started out in and helped built.

19. Between 2010 and 2016, other workers and supervisors were placed in titles or allowed to change office titles and salary. Despite my consistent pleas and formal petitions for grade level change and title change, I was consistently denied.

20. At all times, Defendants kept me under a hostile work environment at ACS, Division of Administration, shuffling me from supervisor to supervisor, all were informed, and thus biased using the discipline history against me.

21. The purpose of the Defendant's adverse employment actions including relocation to Brooklyn warehouse in 2016 was to further humiliate and oppress me, to cause me to be subjected to

---

[2] Laura Postiglione was my supervisor November 2010 until January 2013
[3] Johnny Marmelejos, was the male temp that testified against me, and for Defendants in NYC OATH Index No. 269/13 (Apr.4, 2013). Ecf Doc 62, Exh D
[4] Stephanie Rewitiwiran, was a college intern hired in graphics unit, and later hired as permanent staff under Kaytlin Simmons, chief of staff. She was not mentioned as the fourth witness in NYC OATH Index No. 1924/16. Ecf Doc 62, Exh A

scorn and ridicule within, to interfere with my career, create financial ruin, and to deny or delay justice with aggression to intimidate me. All of this was motivated, at least in part, by selfish animus toward me based on race and retaliation.

22. As alleged in further detail, Defendants' discrimination and retaliation was not limited to hiring and promotion decisions. Discrimination at ACS, extended to the enforcement of workplace policy, the imposition of discipline, training and career opportunities, and, generally, the terms and conditions of employment, including overtime pay. In discipline charges, Defendants' overuse of Supervisors and attorneys' preferred method of management was punishment after punishment. Proffering emergency suspensions, thus the appearance of guilt prior to pleading, the lost of pay, and reputation and disorder in fighting back for wholeness.

23. In 2010, I filed an internal ACS EEO discrimination complaint about Manager, Michael Hannon, Caucasian white male, an Assistant Commissioner,[5] who was consistently acting odd towards me when I asked him work-related questions. Hannon could not look at me in the eye, shivered and fidgeted, and never wanted to meet with me when I had very time-sensitive questions. On many occasions, Hannon was very disinterested and clueless in the work done in Graphics, but was angered and agitated when projects requested were not all accepted that came in the Unit. Hannon acted as though he had owned the property of Graphics Unit and welcomed any little or impossible task. Due to this, I simultaneously filed a grievance over unfair labor practices and salary disparities through the Union and collective bargaining agreement[6]. At the one and only labor meeting with Hannon in 2012, Hannon stated to me "*I did not have to do such a good job*," that which perplexed me. I filed work grievance because I didn't get paid for work transferred to me from two employees who used to work in the unit

---

[5] Assistant Commissioner is an appointed Managerial role.
[6] In the Collective Bargaining Agreement, Steps One and Two were decided by Supervisor and Agency.

from 2008-2010. I didn't get paid for assisting or supervising projects in the Graphics Unit that were not my tasks in my job description.[7] Defendants could've easily changed my title, and awarded me a higher pay grade, but refused to. Instead it took 3 full arbitrations that lasted a year to make Defendants give me the back pay, all which amounted to nothing since ACS had ultimately rescinded my extra pay through their multiple suspensions of pay towards me.

24. In January 2011, I was forced to move out of from an office space and into an open hallway, without a partition, where both male and female coworkers would pass and leer at me making me feel uncomfortable and making it harder to concentrate on jobs for the agency.

25. ACS also did not improve my work conditions as I suggested in my grievances. Eventually, I consulted an outside attorney in 2010 but only under discovery, I discovered that the lawyer referred to me was used by many other ACS employees. In fact, a former ACS worker had sued Hannon for sexual harassment, a case which he lost, however Hannon was still employed in the same managerial role.[8] Hannon's defense lawyer was none other than ACS attorney Susan Hochberg in ACS' Discipline Unit. Susan Hochberg's direct boss was Susan Starker, and their manager was Deputy Commissioner was Joseph Cardieri, Esq. (the group)[9]. The group was furious and felt threatened that I had additional information on Hannon, thus supporting the hostile work environment and agenda against me. The Group, especially Hochberg had a personal vendetta and interest ever since this information transpired.

26. In August 2010, after winning a labor arbitration through the Union grievances, Defendants did not promote me, and officially withheld me from doing higher level work that I had already been successfully been doing. Defendants knew the capabilities of my work, but refused to

---

[7] After completing the steps in the Collective Bargaining Agreement, Arbitrators agreed I was working above my grade level, three (3) times.
[8] ACS is presumptively liable if her supervisor(s) knew of sexual harassment and was part of the background hostile work environment. *Burlington Industries v. Ellerth*, 524 U.S. 742, 765 (1998); *Fairbrother v. Morrison,* 412 F.3d 39, 48-49 (2d Cir. 2005).
[9] The Group is also associated as Susan Hochberg, Susan Starker, Joseph Cardieri

accept it. While I was overworked, and stressed, the Defendants also never granted overtime. Even after winning the Union grievances through the Collective Bargaining Agreement three times, Defendants refused to keep me at the awarded higher level.

27. In November 2010, Hannon placed a new employee, Laura Postiglione, who was originally hired to be the Agency's Press Secretary, as my Supervisor.

   a. Postiglione, a white woman, had worked at ACS for only 3 months, and was originally hired to be a Press Secretary in the Commissioner's Office, separate from the Graphics Unit in the Division of Administration.

   b. In one of my suggestions during the labor grievances, I had suggested that I should work in the Commissioner's office since Hannon knew little about running a Graphics Unit. Hannon, stated another perplexing comment to me that "they needed to exchange a body for a body," however Postiglione was reassigned to my unit without a job posting.[10] Postiglione's reassignment was timely, and approved by Management, after just 3 months on the job as Press Secretary.

28. In February 2011, I was still performing more or less the same duties as Postiglione. After a discussion with Postiglione, Management once again denied a salary adjustment or any parity with Postiglione. Due to the same continued hostile and unfair work environment, I filed a second work grievance. Because of my already discredited reputation by the Defendants, I could not find employment in other departments or agencies.

29. After Postiglione found out I filed a work grievance, Postiglione began to micromanage me more and more, given me 'simple tasks' such as collecting files on a flash drive for her. Around the time of May 2011, I was told by another ACS coworker who I was friendly with and was asking for my services that Postiglione told them "*they should go after the Asian girl*."

---

[10] In 2012, there was no official job posting for a Supervisor of Graphics, nor was there ever any talk of giving me the position I had been doing as Level 2.

We both knew who she was referring to, but due to tension from my grievance, I did not bring up this comment further to anyone. In late February 2012, Postiglione would make a similar comment to coworker and Union rep, Ron Lehman, about me, in which he testified Postiglione was definitely referring to me when she said "*they should have gotten the Asian girl*." Upon that comment and the continued hostile work environment, the SHRL was notified. *See* Ecf Doc 62 Exh B.

30. Accordingly, in about April 2012, Postiglione irately came over to my desk to interrogate me about the SHRL complaint. She said "*it wasn't very nice of you to file a claim about me.*" I stated I wasn't comfortable talking about it with her and asked her to leave my area. That same day, Postiglione came back to my desk asking for a "simple task" for me to collect files for her on a thumb drive. Seconds later, our quick banter about putting in the credits for the agency newsletter escalated into an episode whereas Postiglione accused me of threatening behavior. The Group got together again and proffered discipline charges within the hour as an emergency suspension and I was escorted outside by Security. In May 2012, during my 30-day suspension, I updated my SHRL complaint to include retaliation, since the discipline charges was only two (2) weeks after I filed my SHRL complaint when Postiglione came over to my desk. The SHRL investigation would be closed as soon as I questioned the investigator Yonette Scott at NYS Human Rights Division, if she was related to Yvette Scott, the woman who worked at ACS EEO office.

31. During my 30-day suspension without pay in May 2012, Assistant Commissioner, Sharon McDougall, emailed me at home, and told me I was not allowed to visit any City property, meaning I was not allowed to participate in the volunteer event previously scheduled. Postiglione also called upon a recurring temp, Johnny Marmelejos, who had already a full-time

job with benefits,[11] and hired a college intern, Stephanie Rewitiwiran[12] who was friendly with ACS administrator Dgawanti Parbhudial. In comparison, when I asked for additional resources and graphics help, to be on parity with Postiglione, I was fully denied.

32. Around May 23, 2013, a few days after I returned from my 30-day suspension, I found a note on my desk "*Go home chinese girl*," in which I had reported to the Defendants which they shrugged and did nothing to follow up on it.

33. In June 2013, I then filed an EEOC complaint for discrimination and retaliation, re ACS' discipline charges, and received a Right to Sue Letter. *See* Ecf Doc 62, Exh C

34. In July 2013, I filed an Article 78, in the NYS Court System, to challenge the 30-day suspension pro se. *See* Ecf Doc 62, *Exh E.*

35. In 2014, I was awarded back pay for the Union grievance against Postiglione, but I did not receive a promotion; did not receive a grade level change, and I did not receive a raise.

36. In January 2015, I was blocked from applying for Mayors Scholarship[13]. Personnel Director Faustina Haynes at ACS, stated *"the agency is not able to support me."* The Mayors Scholarship was open to all city employees, with a Bachelors Degree that offered money for training and school, but I was blocked from even applying and pursuing professional development.

---

[11] From Ecf Doc 62 Exh D, who served as witness
[12] From Ecf Doc 62, Exh A, who was 'missing' witness not mentioned
[13] https://www1.nyc.gov/site/dcas/agencies/mayors-graduate-scholarship.page

The Department of Citywide Administrative Services (DCAS) administers the Mayor's Graduate Scholarship Program (MGSP), an opportunity for full-time New York City local government employees (employed by a City agency) with undergraduate degrees to study at accredited colleges/universities in the metropolitan area. Schools fund full or partial graduate scholarships through the Program. The scholarships are for City government employees to study, on their own, in areas such as business and public administration, policy analysis, law, education, engineering, nursing, public health, computer science, and social work

37. In January 2015, I was moved to Office of Deputy Commissioner's, in the Division of Administration to report to (then Chief of Staff), Robert Martin without reason or explanation. Still under Division of Administration, ACS refused to change my office title, which I wanted to reflect my new duties. Martin, however would insist that I was still a graphic artist but not working in the Graphics Unit.

38. After 2 months, intimidation by ACS Supervisors continued at every turn. Martin threatened to write me up because I kept insisting the correct title to match my new duties. He arranged a meeting with an ACS administrator Dgawanti Parbhudial, but we did not meet.

39. In June 2015, I was then shuffled to report to former Associate Commissioner, now Special Advisor, Dan Sedlis who reported to former Special Assistant, now Chief-of-Staff, Kaytlin Simmons, Esq in the Office of the Deputy Commissioner of Administration. As indicated, select workers changed their office titles whichever way they saw fit. Changing of office titles would normally be change of duties, usually a lateral or promotion; none of this which was neither possible nor offered to me. Martin, Postiglione, Simmons, and others were able to change office titles easily. Martin later became Director of Compliance, but remained in the Deputy Commissioner's Office. At that time Robert Martin was Chief of Staff, and Kaytlin Simmons was Special Assistant to the Deputy Commissioner.

40. Between 2014 and 2016, there were constant malfunctions with both my work computers, Apple and PC, where I was reporting issues and generating Help Desk tickets on a daily basis. During the time I was able to log into through remote access, and Defendants specifically monitored my IP address. I reported that I.T/Computer department was sabotaging the City computer so I could not perform my tasks. I.T workers knew about my daily calls to the Help Desk and my inability to perform and function on tasks, having hundreds of ongoing Help Desk tickets. At many times, my P.C monitor would be blurry, visually fading in an out,

Case 1:17-cv-07327-AJN-BCM   Document 65   Filed 07/31/20   Page 12 of 20

Second Amended Complaint:17Cv.7327 (AJN-BCM)    11

blurring the screen, so I would not be able to focus on the screen. My Apple computer was also barely functioning so I could only do simple tasks. Eventually, I had to work on my personal computer so I could generate some work and keep up with my skills. Defendants also did not provide me access to print to the color printer whereas other Postiglione, Marmelejos, Rewitiwiran, Parbhudial and Simmons could.

41. In Jan 2016, my then Supervisor Dan Sedlis retired, and was asked by urgency by Kaytlin Simmons, esq and Susan Hochberg, esq to reprimand me before his last week of retirement. Sedlis sat down with me in his office that week and said "I don't really want to do this." I was puzzled at what he was saying. He shook his head, and started to mention something that happened a couple of days ago and writing things down. I said then "why are you doing this and who is asking you to?" He started to proceed to write but stopped after his phone rang. He said we "will reconvene." At the end of the week, I did not receive a report nor was I not invited to his retirement party. Simmons had urged Sedlis to reprimand me to intimidate me, because Simmons knew that she would violate a disparate treatment amongst her new assistant, Stephanie Rewitiwiran and myself, who later replaced me in Special Assistant/Graphics. See *Ecf* Doc 62 Exh A. (Rewitiwiran was not mentioned in the report of the 4 witness mentioned at the hearing).

42. In February 2016, while reporting to Simmons, I asked if Simmons would proffer discipline charges for Rewitiwiran, who made a huge error on a spreadsheet; Simmons did not answer. This is in stark contrast to the amount of time spent on my disciplines and disputes.

43. In February 2016, I reported to Chief of Staff, Kaytlin Simmons. On March 13, 2016, I was accused of threatening behavior by Simmons, disciplined for 30 days without pay, for an immediate suspension, and was threatened termination again by ACS attorneys Starker, and Hochberg, esq. I only reported to Simmons for two (2) short months. My complaints were once

again dismissed by Defendants and no discussion was held prior to any suspension. Defendants also refused to investigate my side of the story regarding Simmons and myself.

44. On March 14, 2016, I submitted a Workplace Violence Report due to Defendants' retaliatory treatment, based on the fact that Simmons, was threatening me when she shouted "I don't have to answer to you and Get out of her office" when I simply asked her whether she would approve of one-hour overtime and sign off my timesheet.

45. On March 16, 2016, while at home, I communicated with ACS Discipline Director Susan Starker, and asked "*what does Management want from me, so I could readily improve*?" Starker answered misguidingly "*the Union would assist.*"

46. On April 13, 2016, I was transferred to Carnasie Brooklyn warehouse after coming back from my emergency 30-day suspension. I was given 2-hours to pack my belongings, and was never given a reason of my transfer and how I could help the agency with my graphics background. I was not given any specific assignments and was not aware of the duties I had to perform, but nevertheless, I was cooperative and diligent. On April 14, 2016, I attempted to attend a class at City-Wide training center (DCAS)[14], which I was originally approved and scheduled for by Dan Sedlis. After two hours of sitting in the class, and already breaking up into small groups of eight, the Administrator stops the class of 40 and looks around and calls out my name. I walk up to the Administrator and he tells me "you have to leave the class, as there has been a mistake" and without further reason he states "does not know why ACS doesn't want to pay." I suggested to pay the $150 out of pocket first, but the Administrator said no. I walked back to my small group after I had bonded somewhat and told the disappointing news to the group and

---

[14] DCAS Department of CityWide Administrative Services is the administrative arm of the City of New York, the government entity responsible for supporting all City agencies which provide services to the public.

instructor. The instructor was also in shock as I thanked her. As embarrassing as this was for me, the instructor said this class was a bargain and said sorry.

47. The following week when I submitted my timesheet, I noticed that the amount of my payment on my timesheets was not right and was told that my timesheets were altered and two days of pay were withheld because I was considered A.W.O.L on April 14, 2016 when I went to my pre-approved and scheduled training, according to Kenny Charles, Supervisor at the Warehouse; Andre Brown, Assistant Commissioner of Security; and Susan Starker, Director of Discipline. This fact was not covered in Plaintiff's previous administrative trial. Thus Plaintiff asks that the Court read facts asserted here as distinctive facts that support Plaintiff's claims and worth further discovery.

48. On April 20, 2016, I inquired about Workers Compensation being hurt on the job during my rushed packing to be removed off-site. The employee said "ACS would fight you tooth and nail," so I walked away. The employee told me that "ACS is known as a top-heavy agency, full of 'attorneys' and 'supervisors' who take high salaries, collect overtime, and don't do much to earn their high salaries."

49. On July 2016, I filed an internal agency EEO complaint of retaliation due to my involuntary relocation to the Brooklyn warehouse; but again was dismissed.

50. On August 28, 2016, at the hearing regarding the 30-day suspension, which I already served the time, Susan Hochberg said "*I should resign.*"

51. On September 11, 2016, I went to report abuses at Department of Investigation (DOI), in which I saw an ACS director at the location.

52. On September 15, 2016, Personnel at ACS called me at the warehouse location, and forced me to return to 150 William headquarters that same day, to retrieve a termination letter. At the

meeting, personnel asked for my I.D, and had me was escorted out. The Security guard who escorted me out laughed and shook his head in disbelief.

53. When I passed the Security Desk in the lobby, I saw that my picture was already printed and posted, again deliberately shaming and embarrassing me.

54. On February 6, 2017, the Civil Service Commission (CSC) upheld my termination, and 30-day suspension regarding "incompetence, insubordination, and misconduct"

　　　　a. I was denied reinstatement.

　　　　b. I was denied a transfer to another city agency.

55. In February 2017, Susan Starker, the director at ACS, sued ACS for her demotion of incompetence and negligence but was later dismissed in August 2017.

56. In March 2017, I emailed NYC Department of City Wide Administration and Services (DCAS) Commissioner Lizette Camilo, who referred my issue to then Chief of Staff, Quintin Haynes, and emailed me, responded "*I should reach out to ACS.*"

57. In May 2017, I applied for NYS Unemployment and won it once again through adjudication.

58. From January 2017 to 2018, I applied for other employment throughout City of New York and twice I had appointments for interviews, but the scheduler canceled and did not give any reason for canceling, other than the fact that my records are public.

59. In July 2017, I filed a complaint with the EEOC for discrimination and retaliation.

60. On September 18, 2017, the Defendants closed my case to appeal my NYS Unemployment that I received.

61. On September 22, 2017, I exhausted mediation, administrative and collective bargaining remedies.

62. On September 25, 2017, I filed a Discrimination & Retaliation complaint with the district court.

63. Continually, up till present my email on file laurene.yu@gmail.com has been blocked throughout City of New York, and I have further been denied work opportunities.

**Administrative Offices and ALJ rulings, reports and findings**

64. Since 2010, I reported to ACS EEO office, but ACS knew about Assistant Commissioner Hannon's behaviors, and the hostile work environment, dismissing my complaints and did not find fault with Hannon. ACS dismissed my complaint in 2010, well-knowing of Hannon's behaviors. ACS knew about Hannon's sexual harassment case and still kept him employed in the same position. Hannon lost his sexual harassment case using ACS attorney Susan Hochberg as his defense attorney. The group was furious and retaliated against me, when I consulted the attorney the plaintiff used against Hannon. The attorney I counseled with sued Hannon, and won. Hochberg, from ACS, was Hannon's attorney and lost the case.

65. In 2013, when I reported discrimination against Postiglione, to the internal ACS EEO office, my complaints were dismissed again.

66. In 2013, I filed an NYSHR; and at the same time, Postiglione and the group was proffering charges against me.

67. NYC OATH Index No. 269/13 (Apr.4, 2013), Administrative Law Judge (ALJ) Kara J. Miller report, findings and recommendation knew about my NYSHR complaint and knew I filed other complaints.

    a.  Postiglione in her report said she had just "simply changed office titles."

    b.  As alleged in detail, even with my 3 labor grievances awarded, ACS would not 'simply' change my office title. In comparison, there was nothing 'simply' offered for me. During the hearing, Postiglione's union rep, Analyst, Ron Lehman testified on my behalf. Postiglione testified she did not recall if the flash drive actually hit her, and was

unable to recall respondent's exact comments..." Postiglione's testimony was corroborated by Marmelejos despite him seeing anything as well. *See* Ecf Doc62, ExhD

68. In a NYC OATH Index No. 1924/16, ALJ Alessandra Zorgniotti's report and recommendations stated corroboration of 4 witnesses, but only 3 witnesses were documented: Edmund, Mathis, and Sergeant Evans. *See* Ecf Doc 62, Exh A

   a. The report intentionally omitted the 4th witness Stephanie Rewitiwiran, young, former collge-intern, 20's, Guyanese woman, who first worked in Graphics Unit, then hired as Simmons' 'special assistant.'

   b. In 2014, Rewitiwiran started out as a college intern, reported to Postiglione.

   c. In 2016, Rewitiwiran hired, as staff, and reported to Simmons as "Special Assistant".

   d. The report also stated "while there were some minor discrepancies between the witnesses' testimony.... were of the type to be expected in a trial."

   e. As stated ALJ's decisions are based "however, to the extent there were discrepancies between the petitioner's witness and respondent, resolution relied on a determination of witness credibility. In order to determine credibility, this tribunal has looked to witness demeanor, the consistency of a witness' testimony, supporting or corroborating evidence, witness motivation, bias or prejudice, and the degree to which a witness' testimony comports with common sense and human experience in determining credibility. Dept of Sanitation v Menzies, OATH Index No. 678/98 at 2-3 (Feb 5, 1998), aff'd, NYC Civ Serv Comm'n Item No CD 98-101-1A (Sept.9 1998). Citing "Simmons, and her witnesses were credible," stating no apparent motive to lie. *See* Ecf Doc 62, Exh A.

69. In December 2016, The City administrative office, CSC concluded that my termination was justified in my incompetence, and misconduct. But, at no time was I incompetent, nor performed misconduct. I had outperformed and produced each and every time despite the

entire discriminatory and retaliatory hostile work environment, while also having egregious computer(s) problems from 2014-2016, and lacking computer resources and constant denial training and discipline actions. Instead, Defendants never giving me a performance improvement plan, and Supervisors discriminated and retaliated me directly and indirectly targeting me because I was Chinese, yellow in skin color, competent, and protested and reported illegal activities.

70. On 5/21/2018, the district court ordered mandatory mediation, but Defendants rejected and the session was not held.

## ADMINISTRATIVE PROCEDURES

This Amended Complaint surmises from permission from the second circuit court to vacate the district court's decision to allow pro se claimant a leave to amend. *See* Branum v Clark, 927 F. 2d 698, 705 (2d Cir 1991).   Second Circuit also stated "an opportunity now to restate your claims to beef up your specific factual allegations to see whether they add up." *See* Ecf Doc 62, Exh H, Line19-22.

Accordingly, if Plaintiff files an amended complaint, it should include all of the information Plaintiff believes is necessary to make a short, plain statement explaining why she is entitled to relief against each defendant. *See* Ecf Doc 64, Judge Nathan.

# RELIEF

**WHEREFORE**, I, Pro Se Plaintiff demand the following relief against the Defendants, jointly and severally:

a) Compensatory damages in an amount just and reasonable in conformity with the evidence at trial;

b) Punitive damages to the extent allowable by law;

c) Cost and disbursements of this action;

d) Interest;

e) Reinstatement at a proper venue;

f) For such and further relief as this court deems just and proper.

## VERIFICATION

By signing below, I certify to the best of my knowledge, information, and belief that (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

July 31, 2020

Laurene Yu
335 East 14, #52
New York, NY 10009
(917)592-5889 laurene.yu@gmail.com